Argued and submitted May 10, 2016, Southridge High School, Beaverton; affirmed February 8; petition for review denied June 15, 2017 (361 Or 543)

Veronica HERNANDEZ-NOLT,
*Plaintiff-Appellant,*

*v.*

WASHINGTON COUNTY,
*Defendant-Respondent.*

Washington County Circuit Court
C108326CV; A157757

391 P3d 923

Javier Spyker argued the cause for appellant. On the briefs was Manuel C. Hernandez and Hernandez and Associates, LLC.

Christopher A. Gilmore argued the cause and filed the brief for respondent.

Before Sercombe, Presiding Judge, and Tookey, Judge, and DeHoog, Judge.*

---

* Tookey, J., *vice* Hadlock, C. J.

**TOOKEY, J.**

In this wrongful discharge case, plaintiff appeals the trial court's judgment in favor of plaintiff's former employer, defendant Washington County.[1] Plaintiff asserts that the trial court erred when it granted a directed verdict to the county based on its conclusion that plaintiff was not fulfilling an important public duty, which is a required element of a wrongful discharge claim, when she truthfully complied with a federal auditor's request for information about a federal program managed by the county. The county defends the trial court's conclusion, and also proffers an alternative reason for affirming, arguing that we should affirm the court's grant of a directed verdict on the basis that plaintiff failed to present evidence that she was constructively discharged by the county because of her compliance with the federal auditor's requests. We conclude that we should affirm based on the alternative reason advanced by defendant, and do not reach plaintiff's arguments about a public duty.

Because this case is on appeal from a grant of directed verdict to the county, we view the evidence in the light most favorable to the nonmoving party—in this case, plaintiff—and give that party the benefit of every reasonable inference that may be drawn from the evidence. *Fang v. Li*, 203 Or App 481, 484, 125 P3d 832 (2005). In taking that review, we do not weigh conflicting evidence or evaluate credibility. *Id.* at 185. A directed verdict is appropriate only if the defendant was entitled to judgment as a matter of law. *Id.* With that standard in mind, we recite the relevant facts as follows.

In December 1999, the county hired plaintiff as an occupancy specialist and Family Self-Sufficiency (FSS) coordinator for its Department of Housing Services (HS). Prior to that time, plaintiff had worked in other departments at the county for several years. Plaintiff's direct supervisor was Adell Potter, and the assistant director of HS was

---

[1] This appeal is the second time this case is before us. We previously reversed the trial court's grant of summary judgment to the county based on the statute of limitations. *Hernandez-Nolt v. Washington County*, 259 Or App 630, 636, 315 P3d 428 (2013).

Henry Alvarez. Plaintiff was the only FSS coordinator at HS, but she spent only about 10 percent of her time on FSS matters, working on issues as they came up. Plaintiff testified that FSS was not a priority for HS and that she worked on matters that she was told to work on, primarily section 8 housing cases.

In March 2002, HS was scheduled to have a management review of section 8 and low rent public housing programs, including FSS, by the federal Department of Housing and Urban Development (HUD). A management review is a regular audit used by HUD to check that HS is managing the federal programs appropriately. Before the audit, Alvarez told plaintiff and the other occupancy specialists that they needed to "clean up the files" and was angry about the state of the files for the FSS program. During the audit, the federal auditor, Joy McCray, met with plaintiff and Potter. During that interview, Potter answered several questions about plaintiff's job and in doing so, according to plaintiff, made three knowing misrepresentations: (1) that the FSS program had a program coordinating committee; (2) that plaintiff spent 90 percent of her time on FSS and 10 percent on section 8, and (3) that plaintiff did not do housing inspections. Plaintiff did not correct those misrepresentations during the meeting, nor did she subsequently discuss her concerns with Potter. The next day, plaintiff was out of the office conducting housing inspections. The day after that, plaintiff worked in the office and McCray asked plaintiff how she tracked the FSS program contracts. In reply, plaintiff printed off an Excel spreadsheet report for McCray that she personally used to track contracts. Plaintiff also informed McCray that, although Potter had said plaintiff did not perform inspections, she had been out the day before doing inspections.

The HUD audit report revealed with respect to the FSS program that HS did not have a sufficient number of FSS participants; of the 76 active participants, 36 had expired FSS contracts; the FSS coordinator had not recorded into the database 25 new contracts signed in the last five months; the FSS program case management responsibilities were not being accomplished; annual statements reflecting

the status of FSS escrow accounts were not being timely mailed to participants; and only one FSS coordinator was identified when HUD had provided funding for two coordinators. However, the only corrective action required by HUD was that HS review all FSS participant files and handle expired contracts and the respective escrow account as outlined in the corrective action report.

Following the audit, in early April 2002, Potter met with plaintiff and told her that the situation was serious and that plaintiff's case load would be reduced and that she would receive help so that the FSS program issues could be addressed. To do that, some of plaintiff's caseload had to be shifted to other staff, which was addressed at the weekly staff meeting. Plaintiff believed that there was resentment from the staff about the shifting of plaintiff's case load and that Alvarez was "mean" at the meeting. After the meeting, plaintiff was upset and told Alvarez that he could not speak to the staff as he did and said that she had given the federal auditor the report of the FSS contracts. That same day a series of closed door meetings occurred between Alvarez and staff members, ending with plaintiff being called in to talk to Alvarez and Potter. At that time, Alvarez suggested that plaintiff stay home the next day because she was visibly upset, which upset plaintiff enough that she began to cry because she believed she was being required to stay home.

During her day at home, plaintiff wrote a letter to Alvarez and Potter "to express my concerns about the work environment as a result of the recent HUD Audit." In that letter, plaintiff requested "specific goals to be set and tasks outlined" to perform her job and prioritize cleanup of the FSS files. Plaintiff also expressed that the work environment had "deteriorated" and was "hostile and threatening at times" and that she felt that Potter had attempted to use her during the audit to "confirm and corroborate materially inaccurate information to the auditor." Specifically, she noted that Potter had told the auditor that plaintiff provided counseling and follow-up to FSS participants. She also expressed that she believed Alvarez was directing comments to her at the staff meeting when he said something to the effect of not being able to work with people he did not trust. Plaintiff did

not deliver the letter to Alvarez and Potter until two weeks later, after the work environment failed to improve.

To follow up on plaintiff's letter, the county's human resources department conducted an investigation that included a series of interviews with HS staff, and an initial interview with plaintiff, after which plaintiff refused to further participate in the investigation. After that investigation, human resources determined that no one at HS gave intentionally false or misleading information to the federal auditors and that the work environment was not hostile toward plaintiff or other staff.

In June 2002, plaintiff attended FSS program training and earned her certificate. However, Potter did not allow plaintiff to attend a regional FSS housing meeting that occurred after the training because plaintiff was needed in the office. Plaintiff testified that this made her feel "bad" and that she took it as harassment by Potter.

In August 2002, plaintiff received her overdue employee evaluation for 2001. Although the review said that plaintiff met expectations, Potter included a cover letter to plaintiff that explained that the evaluation, which covered 2001, did not reflect Potter's current concerns and that a work plan was being developed to assist plaintiff in improving her ability to manage a full caseload. Because of the cover letter, plaintiff did not concur with the evaluation. Plaintiff believed that her reduced caseload, which occurred so that she could focus on FSS, was improperly being used against her to create a performance issue.

Around the same time, Irma Rafaei became plaintiff's new direct supervisor. Rafaei would continually badger plaintiff about cleaning up the FSS files, and, one day, stood at plaintiff's cubicle for hours pushing plaintiff through the entry of information from several files, which plaintiff called "pure harassment." Following that incident, plaintiff wrote another complaint letter addressed to Susan Wilson, the director of HS, about Rafaei's conduct and alleging that "management's demands continue to promote a hostile work environment which [sic] unfair and unacceptable and outrageous." A week after delivering that letter, Wilson, Alvarez,

Potter, and Rafaei met with plaintiff. At that meeting, Wilson explained the chain of command and informed plaintiff that Rafaei had been giving her one-on-one training. In August 2002, plaintiff's attorney also sent the county a tort claim notice based on the alleged retaliatory conduct plaintiff was experiencing.

In September 2002, plaintiff was taken off of the FSS files and was given a full section 8 housing caseload. Plaintiff saw this as a demotion, even though it did not affect her classification or pay and did not result in any formal discipline. Because she was removed from the FSS program and placed on a work plan, plaintiff "had a severe meltdown." From October 2002 to March 2003, plaintiff saw a psychologist because of her work stress, as well as other life stressors she was experiencing. Plaintiff did not testify about, or provide other evidence of, the work conditions she experienced at HS after she was taken off the FSS program.

In April 2003, plaintiff transferred to the county's Department of Aging and Veterans' Services (DAVS) to get away from the work environment at HS. Her position at DAVS was a promotion and included increased pay. To take the position, plaintiff was required to go on a probationary status. After four months at DAVS, in August 2003, plaintiff was terminated from probationary status, after receiving reprimands for taking extended breaks that were not authorized and counseling on work performance, and reinstated to her former position with HS. She was directed to report to work at HS starting September 3, 2003.

Instead of returning to HS, plaintiff obtained approval for 12 weeks of Family and Medical Leave Act (FMLA) leave due to her stress and anxiety. When her FMLA leave expired on December 23, 2003, plaintiff did not report for work. As a result, Alvarez sent her a letter in January 2004 informing her that she was absent without authorization and that, pursuant to county policy, she was considered to have voluntarily resigned her position. Plaintiff was asked to provide information about any unavoidable situation that prevented her from obtaining authorization for her absence, which would except her from the voluntary resignation rule. After receiving the letter, plaintiff did not attempt to contact

Alvarez and did not return to work at HS. When the county did not hear from plaintiff, the county's counsel confirmed with plaintiff's counsel that plaintiff would not be returning to work. After that confirmation, Alvarez sent plaintiff a final resignation notice that notified plaintiff that her voluntary resignation was effective December 23, 2003.

Plaintiff admitted that while she was on FMLA leave she was not experiencing intolerable working conditions, that nothing that occurred at HS related to her working conditions at DAVS, and that she did not find out what her working conditions would be if she returned to HS. She also did not attempt to apply to work in a different department at the county after her termination from DAVS. However, plaintiff testified that she knew she could not go back to work at HS because Alvarez and Potter were still at HS and she could not work for them.

Plaintiff filed a wrongful discharge claim against the county, alleging that the county constructively discharged her through retaliatory harassment after she refused to participate in Potter's material misrepresentations to the federal auditor. The case went to trial, and, at the close of plaintiff's case, the county moved for a directed verdict. The county argued that it was entitled to a directed verdict for either of two reasons: (1) plaintiff failed to show that she was exercising a job-related right or fulfilling an important public duty when she refused to participate in Potter's misrepresentations to the federal auditor; and (2) plaintiff failed to show that the county constructively discharged her because of her exercise of the alleged job-related right or public duty. The trial court granted a directed verdict for the county based on its conclusion that plaintiff failed to present evidence that she was exercising a job-related right or fulfilling an important public duty. The court did not address the county's second ground for a directed verdict.

On appeal, plaintiff argues that she was fulfilling an important public duty, as embodied in federal law making it a crime to make material misrepresentations to a federal officer, when she truthfully complied with the federal auditor's requests about HS's management of the FSS program. The county defends the trial court's reasoning

for granting the directed verdict and also asserts that we should affirm the trial court's grant of a directed verdict on the ground that the trial court did not address below—that plaintiff failed to demonstrate that she was constructively discharged by the county for fulfilling the important public duty as alleged by plaintiff.[2] For the reasons set out below, we agree with the county that we should affirm the trial court because plaintiff failed to present evidence that she was constructively discharged because she complied with the auditor's requests during the federal audit. Because we affirm on that ground, we do not address plaintiff's argument on appeal regarding whether plaintiff was fulfilling an important public duty when she complied with the auditor's requests during the federal audit.

The general rule in Oregon is that employment is "at will," which means that, "absent a contractual, statutory, or constitutional requirement to the contrary, an employee may be terminated without notice and for any reason." *Nkrumah v. City of Portland*, 261 Or App 365, 372, 323 P3d 453 (2014). However, Oregon has recognized that employers may be liable in tort to an employee for a discharge under "'circumstances in which an employer discharges an employee for such a socially undesirable motive that the employer must respond in damages for any injury done.'" *Id.* (quoting *Lamson v. Crater Lake Motors, Inc.*, 346 Or 628, 635, 216 P3d 852 (2009)). Those circumstances include "when the

---

[2] In effect, the county's argument presents an alternative basis for us to affirm based on the "right for the wrong reason" principle. As a matter of our discretion, we may affirm a trial court's ruling on a basis that was argued by the parties below but that was not relied upon by the court. *Clemente v. State of Oregon*, 227 Or App 434, 440, 206 P3d 249 (2009). We may affirm on such an alternative basis, however, only when (1) "the facts of record [are] sufficient to support the alternative basis for affirmance"; (2) "the trial court's ruling [is] consistent with the view of the evidence under the alternative basis for affirmance"; and (3) "the record materially [is] the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below." *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001).

In this case, we conclude that we should exercise our discretion to affirm on the alternative basis argued by the county. The parties litigated the issue below and made arguments to the trial court in the context of the county's directed verdict motion made at the close of plaintiff's case. Although the court did not grant the directed verdict on that basis, the record is materially the same as it would have been if the trial court had ruled on that basis.

discharge is for exercising a job-related right that reflects an important public policy" or "when the discharge is for fulfilling some important public duty." *Babick v. Oregon Arena Corp.*, 333 Or 401, 407, 40 P3d 1059 (2002).

When, as here, the employee was not discharged but effected a voluntary resignation, the plaintiff must establish that he or she was constructively discharged.

> "[T]o establish a constructive discharge, a plaintiff must allege and prove that (1) the employer intentionally created or intentionally maintained specified working condition(s); (2) those working conditions were so intolerable that a reasonable person in the employee's position would have resigned because of them; (3) the employer desired to cause the employee to leave employment as a result of those working conditions *or* knew that the employee was certain, or substantially certain, to leave employment as a result of those working conditions; and (4) the employee did leave the employment as a result of those working conditions."

*McGanty v. Staudenraus*, 321 Or 532, 557, 901 P2d 841 (1995) (emphasis in original; footnotes omitted). With regard to the second requirement, the Supreme Court explained in *McGanty* that

> "[a]n objective test preserves the requirement that there be a discharge, before there can be a wrongful discharge. If an employee chooses to quit because of objectively *tolerable* working conditions, it cannot be fairly said that the employer has induced the employee to resign rather than be fired. Objectively tolerable working conditions simply are not an inducement to resign."

*Id.* at 556 (emphasis in original; citation, internal quotation marks, and brackets omitted). A constructive discharge is not, in and of itself, a tort; rather, "it is simply an alternate means of establishing the element of discharge in a claim for wrongful discharge." *Handam v. Wilsonville Holiday Partners, LLC*, 225 Or App 442, 447, 201 P3d 920 (2009), *vac'd and rem'd*, 347 Or 533, 225 P3d 43, *adh'd to on remand*, 235 Or App 688, 234 P3d 133, *rev den*, 349 Or 171 (2010). For that discharge to be wrongful, the plaintiff must still establish that the employer's motive for the constructive discharge was the plaintiff's exercise of a job-related right or an important public duty. *Id.*

Plaintiff argues that she met the constructive discharge test because she showed that (1) her working conditions became immediately hostile following the federal audit, including being asked to stay home from work, being harassed by her new supervisor Rafaei, and being the target of "derogatory" remarks by Alvarez, (2) management took no corrective action after plaintiff informed it of the hostile environment, and (3) plaintiff transferred to DAVS as a result of that hostile environment and then took FMLA leave to avoid returning to it.

Granting plaintiff those argued-for inferences, we conclude that plaintiff did not present any evidence at trial from which a trier of fact could reasonably infer she was constructively discharged by the county in December 2003 because of her conduct during the federal audit of HS in March 2002. The only evidence of a hostile work environment that plaintiff presented occurred immediately after the federal audit and ended in September 2002 when plaintiff was taken off of the FSS case files. Plaintiff did not testify about any intolerable conditions at HS that occurred between September 2002 and April 2003 when she transferred to DAVS. Plaintiff was not experiencing the hostile work environment she claimed existed at HS during her four months at DAVS and during her three months of FMLA leave. However, upon her termination from DAVS, plaintiff neither found out what her working conditions would be if she returned to HS, nor did she attempt to apply to work in a different county or department. The only evidence plaintiff presented about the objective working conditions at HS in December 2003, when she resigned, was that Alvarez and Potter still worked there.

Giving plaintiff the benefit of all reasonable inferences from the evidence, as we must, the only inference that the record reasonably permits is that, when plaintiff resigned from the county in December 2003, she *subjectively* believed that she could never work with Alvarez and Potter again. However, plaintiff presented no evidence from which any reasonable inference could be made about plaintiff's *objective* work conditions at HS in December 2003. Plaintiff did not present evidence of the work conditions that she experienced during the seven months prior to her departure from

HS in April 2003 (or why they were intolerable), or evidence about what her work conditions would be if she returned to HS in December 2003. *See Doe v. Denny's, Inc.*, 327 Or 354, 360, 963 P2d 650 (1998) (holding that the plaintiff's wrongful discharge claim failed because "she cannot identify any act or statement by her employer that created or maintained an intolerable working condition that she would be forced to endure if she remained on the job"). In sum, plaintiff did not present any evidence that she was discharged by the county in December 2003—that is, plaintiff presented no evidence from which a reasonable inference could be drawn that Alvarez or Potter were intentionally creating or maintaining an *objectively* intolerable work environment at HS in December 2003—or that plaintiff resigned from the county as a result of that environment at HS. *McGanty*, 321 Or at 556 (a claim of wrongful discharge requires "that there be a discharge, before there can be a wrongful discharge").

It was plaintiff's burden to present sufficient evidence on that issue such that a reasonable factfinder could find in her favor and, on this record, she did not. Accordingly, we conclude that the trial court did not err in granting a directed verdict for the county.

Affirmed.